## JOE STRINGER V. THE STATE.

### No. 11125.   Delivered January 11, 1928.

#### 1.—Rape—Requested Charge—On Isolated Items of Evidence—Rule Stated.

Where, on a trial for rape, the appellant presented a special charge that verbal outcries alone would not satisfy the law with reference to resistance.  This charge was properly refused.  The rule as to the court's charge forbids the singling out of isolated items of evidence and instructing the jury with reference thereto.

#### 2.—Same—Continued.

Nor was it error to refuse a requested charge in effect that if prosecutrix's acts and conduct were reasonably calculated to lead appellant to believe that his acts were not against her consent, to acquit him.  There was nothing in the testimony of prosecutrix that, if believed by the jury, would characterize it as insufficient to meet the full measure of the law's demand that the appellant's acts were against her will, and against the utmost effort on her part to prevent.

#### 3.—Same—Charge of Court—Defensive Theory—Fully Covered in Main 'Charge.

In his main charge the court told the jury in unequivocal terms that to warrant a conviction they must believe not only that she did not consent but that she put forth every exertion and means within her power to thwart the purpose of her assailant.

#### 4.—Same—Requested Charge—Defensive Issue—Not Raised by Evidence— Properly Refused.

Where appellant, on a trial for rape, presented a special charge in effect that if appellant thought that the resistance was feigned or inadequate that he would be guiltless.  Whether in any case of rape the belief of the accused would constitute a defense, no opinion is expressed, suffice it to say that in this case the evidence wholly failed to raise such issue, and the requested charge was properly refused.

Appeal from the District Court of Hall County.   Tried below before the Hon. R. L. Templeton, Judge.

Appeal from a conviction for rape, penalty five years in the penitentiary.

This is the second appeal of this case.   The former opinion is reported in 102 Tex. Crim. Rep. 333.

The opinion states the case.

*Fires & Williams* and *Black & Williams* of Childress, for appellant.

*A. A. Dawson* of Canton, State's Attorney, for the State.

MORROW, PRESIDING JUDGE.—The offense is rape by force,

punishment fixed at confinement in the penitentiary for a period of five years.

At a former trial the verdict condemned the appellant to confinement in the penitentiary for ninety-nine years. Because of evidence improperly received, a reversal was ordered. See 102 Tex. Crim. Rep. 333.

On the present trial the objectionable testimony was omitted.

According to the evidence introduced by the state, Rena Smith, a young woman, eighteen years of age, in August, at the close of school in Canyon, Texas, went by railway train to the neighboring county seat of Tulia, arriving about eleven o'clock at night. She was expected at her home nine miles distant and sought transportation of a jitney driver, who was an old acquaintance. Owing to his age, he declined to make the night trip, but informed the girl that there was a gathering in town, and that it was likely she would find people from the neighborhood of her home who would take her. While on her way to a hotel with the intent of staying there unless she could find conveyance to her home, she met the appellant, a young man about twenty years old, with whom in childhood she had been a schoolmate, though in later years they had not been on intimate relations. He prepared to take her home, and with Hyman as his companion the journey was begun. Hyman was driving and all sat on the same seat, the prosecutrix sitting between them. After reaching a point on the road about half way to her home the car stopped. It was said to be in need of water, to obtain which Hyman went to a creek. While Hyman was away, appellant forced the prosecutrix from the car and ravished her, overcoming her utmost and continued resistance. Thereafter, she was forced into the car by appellant and Hyman, who threatened her life if she reported the occurrence, and prevented her from reporting it until she reached her home. She was released from the car at a point about one hundred yards from her home, and upon entering the house of her parents at once disclosed the outrage. Neighbors and a physician were called; her person and apparel were examined. The details of her condition were given on the trial.

According to the mother of the prosecutrix, she was heard crying before she reached the house, "appeared perfectly wild," was screaming and crying, her sleeve was torn off, her face and dress were muddy, her hair had dirt and a piece of thistle in it, her wrists were swollen and on one of them was a knot, and after entering the house she fainted. Upon undressing her, there appeared bruises on her sides and both of her legs; her

throat was swollen and bruised, and her underclothing was wet with blood.

About the time of the assault, screams of a woman were heard six hundred yards distant from the place of the alleged assault, and she was heard to say: "Oh, my God, turn me loose; no, no, I can't do that."

The following is in substance the version given by the prosecutrix of the occurrence immediately accompanying the assault: When Hyman went for water, appellant grabbed and jerked her out of the car, injuring her wrist and causing a knot to form on it. Twice she got loose and fled, but he pursued her. From her testimony we quote:

"The third time he took hold of me he struck me and it stunned me and knocked the breath out of me. At the same time he struck me, he tripped me, and as I fell one of his legs was between my legs. * * * He got me down and I didn't lose consciousness but I was stunned and I didn't have the strength left that I had had and was out of breath. * * * He was pressing down on me and that had the effect of blocking my breath. * * * And he choked me and that caused my throat to become dry and made it hard for me to breathe and struggle like· I had been struggling. I could hardly breathe and that took much of my remaining strength. * * * After I fell down and he put my hands to my mouth he was holding my hands with his left hand and he proceeded to push my legs apart. One of his legs was already between mine and he had his right hand to push my legs apart, and got his other leg in there between mine. * * * When he knocked me down and tripped me, my dress had gotten pulled up and I didn't have any bloomers on, so he got my underclothes around and got his male organ into mine. * * * While he was trying to do that I continued to struggle all of the time, but my strength was nearly gone, but I never did give up. I squirmed my hips and thighs and turned them as much as I could in an attempt to get away. I never did consent for him to do that and never did cease to resist him."

According to the appellant's testimony, Miss Rena Smith requested him to take her home. He procured the services of Oscar Hyman, together with a truck belonging to the latter. After these arrangements were made, appellant asked the prosecutrix if there was anything in it for him to take her home. She replied: "What do you mean?" He said: "I don't mean money." She replied: "I guess so." Subsequently and before starting on the journey, he remarked to her that her answer to his inquiry was not very definite, and again asked her what

there would be in it for him to take her home. She laughed and said: "I told you that I would a while ago." He claimed that as they were riding (she sitting partly in his lap between him and the driver), he put his arm around her. The engine in the truck stopped running and the radiator was hot. At the appellant's suggestion, Hyman went to a creek for some water. The prosecutrix got out of the truck of her own volition and after conversing with the appellant for a few minutes, walked some forty yards from the truck and there sat down on the ground. His arms were around her and his hand was under her dress. He asked her if she was going to comply with her promise, and she said "no," and gave as a reason that the time was too near that of her "sickness." He replied that that made no difference, and she then said that she did not want to do so. He pushed her over on her back and started to get on top of her when she said "quit." She crossed her legs and he tried to pull them apart when she hollered and said: "Don't do that." From his testimony we quote:

"I told her if she didn't want to do anything to let's go. She said: 'Wait a minute, let's don't go yet.' I asked her if she was going to do anything and she didn't say anything. I pushed her over and crawled over on her and we had intercourse."

He denied any further violence on his part or resistance upon her part. He claimed that before getting out of the truck she took off her hat and laid it upon the ground. He said that he had never before gone with the prosecutrix to any gathering or social function. From his cross-examination touching the immediate occurrence, we take the following quotation:

"There was not any resistance at all on her part when I finally had the intercourse. There was no excitement at all. * * * I don't know whether she liked it or not. She didn't say, but she made no resistance. I don't know whether she was excited or not."

A doctor (who was a witness for the appellant) came and examined the prosecutrix, and, according to his testimony, found two bruises near her shoulders and two on the inside of her thighs. There was a laceration in the lower part of her privates about one-fourth of an inch in size, which was bleeding. Her teddies were bloody. There was more blood than would come from the laceration, and she said the assault had brought on her menstruation. Her condition showed violence, but not a vast amount. She was very nervous, and her pulse was forty beats too rapid. An examination of her female organ disclosed

abrasions leading to the conclusion that there had been a forced penetration.

After the occurrence, while traveling in the truck, the prosecutrix declared that she was suffering with extreme thirst. According to her testimony, she made the statement with the hope that she might escape and reach the abode of friends. Appellant's testimony was to the effect that when she proclaimed her thirst, she was permitted to get out of the car and started for water in company with Hyman, but returned to the car and left Hyman to go for the water alone. About the same time her hat was missed and the truck was driven back by her assailants and the hat recovered.

It is not practical to set out all the testimony, especially upon collateral matters. No attempt has been made to do more than to state such part as is deemed sufficient to illustrate the legal questions involved in the appeal.

In paragraph 6 of the main charge the jury was instructed that if Rena Smith consented to the sexual intercourse, there should be an acquittal.

In paragraph 7 the question of resistance was expressed in the following terms:

"But unless you find and believe beyond a reasonable doubt that the said Rena Smith made and used every exertion and means within her power under the circumstances to prevent such carnal knowledge, if any, you will acquit the defendant."

"In this connection, you are instructed that mere sexual intercourse, coupled with passive acquiescence, is not rape by force. There must be resistance upon the part of the alleged injured female, dependent upon the circumstances surrounding her at the time and the relative strength of her and the defendant, and every exertion and means within her power under the circumstances must be made to prevent the penetration of the sexual organ of the female by the sexual organ of the defendant; and unless such means and exertions are used, the defendant should be acquitted, and if you so find or have a reasonable doubt thereof, you will acquit the defendant."

Six special charges were requested. Charge No. 6, which was given to the jury, reads as follows:

"If you find from the evidence that the defendant had intercourse with the witness, Rena Smith, and that the witness, Rena Smith, made resistance to the acts and force by the defendant, if any, but that such resistance was feigned, and not real, you will acquit the defendant, or if you have a reasonable doubt as to these facts, you will acquit the defendant."

In none of the other requested special charges is there aught which is not embraced in the main charge, save in charges Nos. 2 and 3. Charge No. 2 contained an instruction that verbal outcries along would not satisfy the law with reference to resistance. To have given such a charge would have offended against the rule forbidding the singling out of isolated items of evidence and instructing the jury with reference thereto. Charge No. 3, upon which emphasis is laid in the brief, was in effect an instruction to the jury containing the following:

"* * * and that her conduct was such as was reasonably calculated to lead him to believe that his acts were not against her consent, or if you have a reasonable doubt that the defendant believed from her acts and conduct that his acts were not against her consent, then you will acquit the defendant."

The testimony of the prosecutrix, if believed by the jury, is without incidents which are deemed indicative of implied consent, feigned resistance or acquiescence. Certainly we have perceived nothing in her testimony which, as a matter of law, would characterize it as insufficient to meet the full measure of the law's demand that the appellant's act was against her will, be demonstrated, not alone by her words but by the utmost effort in her defense. Her testimony is not without corroboration. Her outcries and protests were heard at a distance of hundreds of yards. She reached her home besmirched with mud, her clothing soiled, bloody and in disarray, her person bleeding, her nerves shattered, with cries of anguish proclaimed the outrage, and fell fainting in the home of her parents.

Guided by the charge of the court in which they were told in unequivocal terms that to warrant a conviction they must believe not only that she did not consent but that she put forth every exertion and means within her power to thwart the purpose of her assailant, the jury concluded that she was ravished; that the force used by the appellant overcame all resistance which she was able to put forth. If we comprehend the idea advanced in special charge No. 3, it is that if the jury should believe that the appellant thought that her resistance was feigned or inadequate, that he was guiltless. Whether in any case of rape the belief of the accused would constitute a defense, no opinion is expressed. In our judgment, in the present instance, such issue does not appear. The appellant does not claim that the conduct which he described misled him. He does not concede that the things which she detailed happened. It was his position and testimony that before she entered on the journey she agreed to submit to his embraces; that when he claimed this privilege she

at first made a mild protest, which she later withdrew, and that the final act was without any manifestation of opposition.

On the record before us, the opinion is expressed that the evidence is sufficient to support the conclusion reached by the jury and that the charges given were adequate to properly guide the jury and fully protect the accused in all his legal rights.

The judgment is affirmed.

*Affirmed.*